J-S45034-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ROLAND THOMPSON, | : | |
| | : | |
| Appellant | : | No. 1542 EDA 2016 |

Appeal from the Judgment of Sentence February 5, 2016
in the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009852-2013

BEFORE:     GANTMAN, P.J., PANELLA, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:     **FILED SEPTEMBER 11, 2017**

Roland Thompson (Appellant) appeals from the judgment of sentence of seven to fifteen years of imprisonment, followed by ten years of probation, imposed after he was convicted of voluntary manslaughter, a violation of the Uniform Firearms Act (VUFA), and possession of an instrument of crime.  We affirm.

In the early morning hours of November 23, 2012, a wild-west-style shoot-out near a bar in Philadelphia resulted in the death of bystander Johnika Tiggett, who was killed by a single gunshot wound to the back of the neck.  The bullet recovered from her body was a .40 caliber Smith & Wesson.  Witnesses placed Appellant at the scene, involved in the firefight, with a .40 caliber firearm.

_____
*Retired Senior Judge assigned to the Superior Court.

A jury convicted Appellant of the crimes listed above, and he received the above-indicated sentence. Appellant thereafter timely filed a post-sentence motion and, following its denial, a notice of appeal. On appeal, Appellant challenges the sufficiency of the evidence to sustain his convictions, arguing that the Commonwealth failed to disprove that Appellant acted in justifiable self-defense. Appellant's Brief at 9-10. Appellant also claims that the verdict is against the weight of the evidence. *Id.* at 11-13.

Following a review of the certified record and the briefs for the parties, we conclude that the opinion of the Honorable Rose Marie DeFino-Nastasi thoroughly addresses Appellant's issues and arguments and applies the correct law to findings of fact that are supported by the record. We discern no abuse of discretion. Therefore, we adopt the trial court's opinion of August 29, 2016 as our own and affirm Appellant's judgment of sentence based upon the reasons stated therein.[1] ***See*** Trial Court Opinion, 8/29/2016, at 14-18 (explaining, *inter alia*, that the evidence supported a finding of imperfect self-defense because Appellant used more force than necessary and did not retreat); ***id.*** at 18-19 (concluding that the verdict did not shock the trial court's sense of justice).

Judgment of sentence affirmed.

---

[1] The parties shall attach a copy of the trial court's August 29, 2016 opinion to this memorandum in the event of further proceedings.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 9/11/2017

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

### CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  CP-51-CR-0009852-2013

v.  1542 EDA 2016



CP-51-CR-0009852-2013 Comm. v. Thompson, Roland
Opinion

ROLAND THOMPSON

7492048111

**OPINION**

**FILED**

AUG 29 2016

Criminal Appeals Unit
First Judicial District of PA

Rose Marie DeFino-Nastasi, J.

### PROCEDURAL HISTORY

On October 30, 2015, Defendant was found guilty after a jury trial, presided over by the Honorable Rose Marie DeFino-Nastasi, of Voluntary Manslaughter, 18 Pa.C.S. § 2503, as a felony of the first degree; Violation of the Uniform Firearms Act (VUFA), 18 Pa.C.S. § 6105, as a felony of the second degree[1]; VUFA 18 Pa.C.S. § 6108, as a misdemeanor of the first degree; and Possession of an Instrument of Crime (PIC), 18 Pa.C.S. § 907, as a misdemeanor of the first degree.

On February 5, 2016, Defendant was sentenced to seven (7) to fifteen (15) years for the voluntary manslaughter conviction; ten (10) years probation for the VUFA § 6105 conviction; and no further penalty for the VUFA § 6108 and PIC convictions.

On February 9, 2016, Defendant filed a post-sentence motion, which was denied without a hearing on April 12, 2016.

On May 11, 2016, Defendant filed the instant appeal to the Superior Court.

---

[1] Defendant proceeded to a jury trial on all charges except for VUFA § 6105. The trial was bifurcated to keep the jury from hearing any testimony regarding prior convictions. After the jury returned its verdict, Defendant elected to waive his right to a jury trial on the bifurcated charge of VUFA § 6105 and was found guilty. N.T. 10/20/15 at pp. 21-22; N.T. 10/30/15 at pp. 36-38.

1



On June 14, 2016, Defendant filed a Rule 1925(b) Statement of Matters Complained of on Appeal, pursuant to an Order of the court, claiming that:

1. The evidence was insufficient to sustain the verdict of guilt on all charges. The evidence did not establish that the Defendant was a principal, conspirator, or an accomplice to any of the crimes. The Commonwealth failed to prove beyond a reasonable doubt that the Defendant did not act in justifiable self-defense.

2. The verdict was against the weight of the evidence and based on suspicion, conjecture, and surmise.

## STATEMENT OF FACTS

On November 23, 2012, at approximately 1:30 a.m., Officer Kenneth Downing responded to a radio call reporting multiple gunshots in front of Buffy's Bar on the corner of Clarissa and Dennie Streets in Philadelphia. N.T. 10/20/15 at pp. 117-20. He observed multiple shell casings in the street when he arrived. The decedent, Johnika Tiggett, was lying face-down, unresponsive at the opposite end of Dennie Street near Wayne Avenue. *Id.* at pp. 121-27.

Dr. Albert Chu, Deputy Chief Medical Examiner, testified that the cause of death was a single gunshot wound to the back of the neck. The manner of death was homicide. N.T. 10/22/15 at pp. 11-12, 21.

Lonay Newkirk was with the decedent and some friends at Buffy's Bar on the night of the shooting. N.T. 10/20/15 at pp. 136-37. The decedent told her that one of the boys they were with, Rashon "Roddy" Wiggins[2], and a boy named "Tamir" were going to fight. She identified co-defendant Anthony Palmer as Tamir. *Id.* at pp. 144-47.[3] The two women exited the bar. A

---

[2] Rashon Wiggins is awaiting trial for murder and related charges in connection with the death of Johnika Tiggett. CP-51-CR-0007695-2015.

[3] The jury acquitted co-defendant Anthony Palmer of all charges. CP-51-CR-0009851-2013.

male who was with them, Terrell "Rell" Antwon[4], came out of the bar with his jacket open and a gun in his waistband. Ms. Newkirk overheard Rell say that "Roddy got them into some bullshit and he didn't know how to get out of it." *Id.* at pp. 171-74.

The decedent walked towards Rell's car which was parked on Dennie Street. *Id.* at pp. 142-44, 220-21. Ms. Newkirk asked the decedent to leave with her. When the decedent refused, Ms. Newkirk went back into the bar to get the rest of their friends. When she came back outside, Rell and Tamir were having a verbal altercation in the middle of Clarissa and Dennie Streets. *Id.* at pp. 149-55, 171.

Ms. Newkirk walked down Dennie Street towards Wayne Avenue. Suddenly, people on both sides of the street began shooting at each other. *Id.* at pp. 146-50. She ran and ducked between two cars. When she looked up, she saw the decedent running down the middle of Dennie Street. Rell and Roddy were shooting toward Buffy's Bar. Three guys, including co-defendant Palmer, were standing outside of Buffy's Bar shooting down the street towards Rell, Roddy, and the decedent. *Id.* at pp. 176-80.

Ms. Newkirk called the decedent's phone when the gunfire stopped. There was no answer. As she started to walk towards the decedent's mother's house, someone approached her and stated that the decedent had been shot. *Id.* at pp. 156-58.

Millicent Harvey was in her home on the 2000 block of Dennie Street when she heard people arguing in front of Buffy's Bar. N.T. 10/21/15 at pp. 114-19. A group of men were standing in the middle of Clarissa Street when she looked out of her second-floor window. Ms. Harvey moved away from the window. When she heard the men moving closer towards her home, she looked outside a second time. *Id.* at pp. 120-22. Two or three men were standing on

---

[4] Terrell Antwon is awaiting trial for murder and related charges in connection with the death of Johnika Tiggett. CP-51-CR-0007696-2015. His co-defendant in that case is Rashon Wiggins. CP-51-CR-0007695-2015.

3

the south side of Dennie Street near the bar. *Id.* at p. 158. Ms. Harvey identified the Defendant, whom she described as "a bald, light-skinned guy with a close-cut beard," as one of the three men. *Id.* at pp. 123-25, 152-54; N.T. 10/27/15 at p. 28. Another male, later identified as Terrell "Rell" Antwon, was standing with four or five girls closer towards the north side of Dennie Street. N.T. 10/21/15 at pp. 143-44. Rell was telling the girls to leave and that he would meet them "at the spot." *Id.* at pp. 155-56.

The Defendant was standing behind a Buick Rendezvous parked on the south side of Dennie Street a few houses away from Buffy's Bar. He was talking to the other men standing outside of the bar and appeared to be reading something that he had retrieved from his pocket. N.T. 10/21/15 at pp. 147, 159-61. Rell walked over to the Defendant and was "talking to him like they were friends but they were whispering." *Id.* at p. 161. The Defendant "kept going to his hip when he was talking." *Id.* at p. 158. Rell walked away from the Defendant north towards the sidewalk. Before Rell got to the curb, he turned around and fired multiple shots towards the three men on the other side of the street. *Id.* at pp. 128-30, 158. Rell was running down Dennie Street towards Wayne Avenue as he continued firing his weapon. *Id.* at p. 133.

Ms. Harvey testified that the three men on the south side of Dennie Street "started shooting to defend themselves and they were running down the street on each side, shooting at each other like the Wild West." *Id.* at pp. 132-33. She saw the Defendant "pull out something" which she believed to be a gun because she "heard extra shots." *Id.* at pp. 130-31, 158. Ms. Harvey couldn't recall how many shots, she just knew that it was "a lot" and that it sounded like multiple guns were being fired. *Id.* at pp. 131-32.

Officer Robert Hoover responded to a radio call reporting a gunshot victim at Frankford Hospital at approximately 2:00 a.m. on November 23, 2012. The Defendant was being treated for

4

a gunshot wound to the right thigh when he arrived. N.T. 10/22/15 at pp. 36-37. Co-defendant Byron McDonald, a man who identified himself as "Manny Butler" (later identified as the Defendant's brother), and the Defendant's teenage son, Roland Thompson, Jr., were with him. *Id.* at pp. 42, 57. McDonald stated that he drove the Defendant to the hospital in his black Ford Conversion Van E-150, which was parked in the emergency room parking lot. *Id.* at pp. 42, 46, 84-85, 137-38. Officer Hoover went outside to the vehicle and observed blood on the right side of the passenger's side seat and on the vehicle itself. *Id.* at pp. 44, 49-51.

The Defendant initially identified himself as "Tyrone Butler," but kept misspelling his last name. He eventually told the officer that he was "misleading" him and provided his actual name, Roland Thompson, and an address of 2423 West Toronto Street. The Defendant stated that "he was involved in a narcotics transaction . . . two black males attempted to rob him, a struggle ensued and he was shot in the leg." *Id.* at pp. 34-38, 41, 52-54. One was a black male, dark skinned, approximately 5'8", 210 pounds, 30 to 35 years-old, black hoodie, black jeans. The other was a black male, medium brown, 5'8", 200 pounds, black hoodie. *Id.* at p. 41.

The Defendant stated that he was shot at "Torresdale and Carver," then changed the location to the 4800 block of Penn Street, one block from the hospital. *Id.* at pp. 38-39. Officer Hoover testified that there were no radio calls reporting gunshots or any kind of incidents in that area. He also conducted a visual inspection of the 4800 block of Penn Street with negative results. *Id.* at pp. 39, 41.

Counsel stipulated that the medical records from Aria Hospital show that the Defendant was treated for a gunshot wound to the right upper thigh and a graze wound to the left shoulder. N.T. 10/29/15 at pp. 27-28.

5

Byron McDonald[5] testified that he had been friends with the Defendant, whom he knew as "Mustafa," and his son, Roland "Man-Man" Thompson, Jr., for approximately ten years. N.T. 10/22/15 at pp. 98, 104-05. He ran into them near the Defendant's home on Toronto Street on the night of the shooting. *Id.* at pp. 88-91, 97-99. The Defendant and McDonald spoke and decided to go to Buffy's Bar. McDonald drove. He parked his black E-150 Conversion Van on Clarissa Street approximately four cars away from Dennie Street. *Id.* at pp. 98-104. Man-Man stayed in the car because he was underage. *Id.* at p. 104.

The Defendant and McDonald were in Buffy's Bar for an hour-and-a-half before the shooting. *Id.* at p. 102. Co-defendant Palmer was standing three feet away from McDonald talking to a group of women while they were there. *Id.* at p. 109. McDonald walked out of the bar to use his phone. When he came back inside, a group of people, including co-defendant Palmer, were arguing back and forth. *Id.* at pp. 114-16. The group that was arguing eventually went outside. *Id.*

When the Defendant and McDonald left the bar a few minutes later, co-defendant Palmer was arguing with a male, identified as Rashon "Roddy" Wiggins, on the opposite side of Dennie Street from Buffy's Bar. *Id.* at pp. 116-19. A second male, identified as Terrell "Rell" Antwon, approached and also started arguing with Palmer. The decedent was telling everybody to "chill." Roddy and the decedent walked away from the argument. *Id.* at pp. 121, 159-60, 169. The Defendant, Man-Man, and McDonald were standing on the sidewalk in front of a house next door to Buffy's Bar. Co-defendant Palmer turned to walk towards them. As he did, Rell started shooting at them from across the street. *Id.* at pp. 121-22, 151. The Defendant, Man-Man, co-

---

[5] On October 19, 2015, Byron McDonald entered into an open guilty plea to third degree murder, conspiracy, and VUFA § 6108 in exchange for his cooperation in this case and [enter other case]. CP-51-CR-0009850-2013; N.T. 10/22/15 at pp. 90-97. He is awaiting sentencing as of the filing of this Opinion.

6

defendant Palmer, the security guard at Buffy's Bar, and McDonald returned fire. *Id.* at pp. 122-28.

The Defendant ducked behind a car near the curb when the shooting started. He fired multiple shots from a .40 caliber semi-automatic firearm. McDonald had seen the Defendant with the gun prior to the night of the shooting, and he had it with him when they went to Buffy's Bar. *Id.* at pp. 126-27. Man-Man was standing to McDonald's left and was shooting a .32 caliber semi-automatic firearm. *Id.* at pp. 128-29. Co-defendant Palmer was standing in the street and fired more than two shots. McDonald did not know what type of gun Palmer had. *Id.* at p. 125. The security guard at Buffy's Bar was standing on the corner near the bar shooting a .38 caliber chrome revolver. *Id.* at pp. 131-32, 222-23. McDonald ducked behind a tree in front of the bar. He fired four shots from a .45 caliber revolver. *Id.* at pp. 123-25.

Rell continued to shoot as he ran down Dennie Street towards Wayne Avenue. McDonald estimated that Rell fired between fifteen and eighteen shots. *Id.* at p. 209. He also testified that a second person who was closer to Wayne Avenue, presumably Roddy, was shooting west down Dennie Street towards the bar. *Id.* at pp. 130-31, 211.

The Defendant was shot in the leg and ran to McDonald's van along with McDonald and Man-Man. The Defendant sat in the passenger's seat. When the van wouldn't start, the Defendant got out of the van and into a car with a girl he had been talking to at the bar. *Id.* at pp. 134-37. McDonald went to his house and put the .45 caliber revolver under his bed. He reloaded the gun and discarded the fired cartridge casings. He eventually went to Frankford Hospital where the Defendant was being treated. *Id.* at pp. 142-45.

7

McDonald gave a statement to detectives and consented to a search of his house. Detectives recovered the .45 caliber firearm. *Id.* at pp. 155-59.[6] He identified photos of the decedent, the Defendant, Man-Man, co-defendant Palmer (whom McDonald identified as "Shamir"), the security guard from Buffy's Bar (Steven Guy), and Rell. *Id.* at pp. 160-69.

Steven Guy was determined to be unavailable at the time of trial. His testimony from the preliminary hearing was read into the record. Mr. Guy testified that Rashon "Roddy" Wiggins and co-defendant Palmer (whom he knew as Tamir) were arguing on the corner of Clarissa and Dennie Streets outside of the bar. N.T. 10/28/15 at pp. 172-73, 198, 223. The argument "was over Tamir touching a female that was with [Roddy] and [Roddy] felt disrespected." *Id.* at p. 195. The Defendant (whom he knew as Mustafa), McDonald, and the Defendant's son were also outside. *Id.* at pp. 175-76. The Defendant was standing to his left outside of the doorway to the bar; McDonald was standing to his right. *Id.* at pp. 200-01. "[T]he argument escalated to a point that guns were drawn." *Id.* at p. 193. Mr. Guy observed the Defendant, co-defendant Palmer, McDonald, and the "short dude with the scruffy beard that drives the white Buick LeSabre," later identified as Terrell Antwon, shooting at each other. *Id.* at pp. 191-94.

Detectives James Pitts and Ronald Dove interviewed co-defendant Palmer at 11:56 a.m. on November 24, 2012. N.T. 10/28/15 at pp. 114-22. Palmer did not give a formal statement. An Activity Sheet reflects that he stated that he dropped to the ground when the shooting started and was grazed in the head. *Id.* at pp. 123-25.

Officer Jesus Cruz, Firearms Identification Unit, determined that there were at least four firearms used at the crime scene. N.T. 10/27/15 at pp. 115-23. He testified that fired cartridge

---

[6] Detective Howard Peterman testified that a Taurus revolver loaded with five (5) live .45 caliber bullets was recovered from McDonald's home on the 3100 block of North 25th Street. N.T. 10/27/15 at pp. 35-36. Officer Jesus Cruz, Firearms Identification Unit, testified that none of the ballistics evidence matched the .45 caliber firearm recovered from McDonald. *Id.* at p. 168.

8

casings (FCC) from a semi-automatic firearm eject approximately three (3) to five (5) feet when discharged. The distance the FCC ultimately travels when it is ejected is dependent upon where and how the FCC lands. *Id.* at p. 97.

William Whitehouse, Crime Scene Unit, testified that ten (10) fired cartridge casings (FCC) from a .9 millimeter firearm were collected from the north side of Dennie Street. N.T. 10/23/15 at pp. 193-94. The placement of the FCCs indicated that the shooter was moving on the sidewalk of Dennie Street towards Wayne Avenue as they were shooting. N.T. 10/26/15 at pp. 9-10; N.T. 10/28/15 at pp. 70-71.

Eleven (11) FCCs from a .40 caliber Smith & Wesson handgun were collected from the middle and south side of Dennie Street near Buffy's Bar. N.T. 10/23/15 at pp. 196-97. The placement of the FCCs indicated that the shooter moved to/from the rear of a Buick Rendezvous (V1) parked on the south side of Dennie Street to/from the middle of Dennie Street. N.T. 10/28/15 at pp. 70-72. Counsel stipulated that the projectile recovered from the decedent's body was a .40 caliber Smith & Wesson. N.T. 10/27/15 at pp. 144-45. Officer Cruz testified that all of the .40 caliber ballistics evidence recovered was fired from the same .40 caliber Smith & Wesson. *Id.* at p. 122.

Eleven (11) FCCs from a second .9 millimeter firearm and two (2) FCCs from a .32 caliber firearm were collected from the south side of Dennie Street. N.T. 10/23/15 at pp. 197-200. The placement of the FCCs fired from those two firearms were in a more centralized location, indicating that the respective shooters were stationary. N.T. 10/26/15 at pp. 9-10.

Ballistics evidence was collected from multiple vehicles parked on Dennie Street.

The closest vehicle to Buffy's Bar was a Buick Rendezvous (V1) parked facing westbound in front of 2050 Dennie Street. The vehicle had a bullet hole in the exterior of the

9

front passenger's side door. N.T. 10/23/15 at pp. 162, 178-79. Officer Steven Berardi testified that there were several strike marks through the front passenger's side door and two strike marks on the windshield of the vehicle. The strike mark on the passenger's side door was consistent with the bullet hole. N.T. 10/26/15 at pp. 27-30. Officer Berardi determined that the bullet was traveling in an upward angle towards the north side of Dennie Street. *Id.* at pp. 31-32.

A bloodstain was observed on the sidewalk south of the Buick Rendezvous. N.T. 10/26/15 at pp. 2-3, 8. Counsel stipulated that a swab of the bloodstain was submitted for DNA analysis. Testing established that it was co-defendant Palmer's blood. N.T. 10/28/15 at pp. 265-66.

A Dodge Durango (V2) was parked facing westbound between 2046 and 2048 Dennie Street directly east of the Buick Rendezvous (V1). N.T. 10/23/15 at pp. 162, 176-77. Officer Berardi testified that there was damage to the hood, grill area, and bumper guard. Based on the contact points, he was able to determine that these projectiles were traveling toward the front of the vehicle. N.T. 10/26/15 at pp. 16-20. A .9 millimeter FCC was recovered from the area where the hood meets the front grill and from underneath the Durango when the police towed the vehicle. *Id.* at pp. 22-24; N.T. 10/28/15 at p. 262. Both FCCs matched the other .9 millimeter FCCs recovered on the south side of Dennie Street. N.T. 10/27/15 at pp. 132-33.

The Dodge Durango had damage to the driver's side door. A .40 caliber projectile was recovered inside of that door. N.T. 10/26/15 at pp. 58-60. Officer Berardi determined that the projectile was traveling at an angle towards the front of the vehicle. *Id.* at p. 20. Officer Cruz testified that the projectile was fired from the same .40 caliber Smith & Wesson that fired the .40 caliber FCCs collected from middle and south side of Dennie Street near Buffy's Bar. N.T. 10/27/15 at pp. 145-46.

An Isuzu Rodeo (V3) was parked facing westbound in front of 2047 and 2049 Dennie Street, across the street and east of the Buick Rendezvous (V1) and the Dodge Durango (V2). N.T. 10/23/15 at pp. 173-74. Officer Berardi testified that the back window was shattered and there was damage to the rear-view mirror. N.T. 10/26/15 at pp. 41-42. The projectile came from behind the vehicle on the passenger's side and in a downward angle into the vehicle. *Id.* at p. 43. A bullet jacket was recovered from the rear cargo area of the Isuzu and from the inside rear-view mirror. Both bullet jackets were fired from a .9 millimeter firearm. *Id.* at pp. 45-47. Officer Cruz testified that the bullet jackets matched the .9 millimeter ballistics evidence collected from the north side of Dennie Street. N.T. 10/27/15 at pp. 147-49.

A Buick LeSabre (V4) parked facing westbound in front of 2039 and 2041 Dennie Street had a strike mark on the front driver's side fender. N.T. 10/23/15 at pp. 170-72; N.T. 10/26/15 at pp. 34-36. A .40 caliber projectile was recovered from the floor on the driver's side of the vehicle. *Id.* at pp. 37-39. The location of the projectile was consistent with the trajectory of the strike mark to the front driver's side fender. *Id.* at p. 38. The projectile was fired parallel to the vehicle, indicating that the shooter was standing toward the front of the vehicle. *Id.* at pp. 36-37. Officer Cruz testified that the .40 caliber projectile matched the other ballistics evidence fired from the .40 caliber Smith & Wesson, including the projectile recovered from the decedent's neck. N.T. 10/27/15 at pp. 141-46.

A Chevrolet TrailBlazer (V5) parked facing westbound in front of 2036 Dennie Street had damage to the exterior upper passenger's side windshield. N.T. 10/23/15 at pp. 180-81.

A Ford Expedition (V6) was parked facing westbound in front of 2012 and 2014 Dennie Street near Wayne Avenue. N.T. 10/23/15 at pp. 169, 181-82. Officer Berardi testified that there was damage to the rear driver's side of the vehicle and strike marks on the hood on the front

11

passenger's side and the passenger's side view mirror. N.T. 10/26/15 at pp. 49-50. A bloodstain was observed on the street north of the Ford Expedition where the decedent's body was found. N.T. 10/23/15 at pp. 169, 183.

Officer Berardi testified that there was blood on the floor of the front passenger's side of Byron McDonald's black 1997 Ford Econoline Conversion Van. N.T. 10/26/15 at pp. 52-53. Counsel stipulated that a swab of the bloodstain was submitted for DNA analysis. Testing established that it was the Defendant's blood. N.T. 10/28/15 at pp. 266-67.

## ANALYSIS

### Issue I

Defendant argues that the evidence was insufficient to sustain the verdict of guilt on all charges[7] because (1) the evidence did not establish that the Defendant was a principal, conspirator, or an accomplice to any of the crimes[8]; and (2) the Commonwealth failed to prove beyond a reasonable doubt that the Defendant did not act in justifiable self-defense.

The standard of review for a challenge to sufficiency is well-settled.

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the

---

[7] The jury found the Defendant guilty of Voluntary Manslaughter, VUFA § 6108, and PIC.
[8] The jury was only charged on accomplice liability. N.T. 10/29/15 at pp. 217-19.

12

evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

*Com. v. Slocum*, 86 A.3d 272, 275–76 (Pa. Super. 2014) (citing *Com. v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), app. denied, 987 A.2d 158 (Pa. 2009) (quoting *Com. v. Smith*, 956 A.2d 1029, 1035-36 (Pa. Super. 2008) (*en banc*)).

Defendant was convicted of voluntary manslaughter under 18 Pa.C.S. § 2503. The law provides for a conviction of voluntary manslaughter under two different circumstances. A person is guilty of voluntary manslaughter if, either he acted under a sudden and intense passion

resulting from a serious provocation or if he "knowingly and intentionally kills an individual" under the unreasonable belief that the killing was justified. 18 Pa.C.S. § 2503(a)-(b).

This case involves a conviction for voluntary manslaughter where the actor unreasonably believed the killing was justified. 18 Pa.C.S. § 2503(b). A person is guilty of unreasonable belief voluntary manslaughter, more colloquially referred to as "imperfect self-defense," if he knowingly and intentionally kills someone under the unreasonable belief that the killing was justified; the affirmative defense of self-defense, if accepted, results in an acquittal because it constitutes a justification for the conduct charged. *Com. v. Mouzon*, 53 A.3d 738 (Pa. 2012) (citing 18 Pa.C.S. § 2503(b)).

A claim of imperfect self-defense must satisfy all the requisites of justifiable self-defense. Generally, the use of deadly force is not justifiable unless the actor believes that such force is necessary to protect himself against death or serious bodily injury. 18 Pa.C.S. § 505(b)(2). Although a defendant has no burden to prove a claim of self-defense, before such a defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." *Com. v. Sepulveda*, 55 A.3d 1108, 1124 n. 13 (Pa. 2012). The evidentiary elements necessary to prevail on a justification defense are that the defendant (a) reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim (or another person in the case of transferred intent[9]) to prevent such harm; (b) was free from fault in provoking the difficulty which culminated in the slaying; and (c) did not violate any duty to retreat. *Id.* at 1124 (citing 18 Pa.C.S. § 505).

The Commonwealth sustains its burden of disproving self-defense if it proves any of the following: that the defendant was not free from fault in provoking or continuing the difficulty

---

[9] *Com. v. Martin*, 5 A.3d 177, 208 (Pa. 2010).

which resulted in the slaying; that the defendant did not reasonably believe that he was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save himself therefrom; or that the defendant violated a duty to retreat or avoid the danger. *Sepulveda*, 55 A.3d at 1124 (citation omitted).

> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Mouzon*, 53 A.3d at 752.

Since the Defendant did not testify and describe his subjective thinking, the jury had to rely on inferences from the evidence presented at trial. The jury's verdict of guilt for the charge of voluntary manslaughter reflects that it found that the Commonwealth disproved Defendant's claim of self-defense beyond a reasonable doubt, and that the Defendant had an unreasonable, rather than a reasonable, belief that deadly force was required to save his life in light of the facts and circumstances of the case. 18 Pa.C.S. § 505(b). The evidence was sufficient to support the jury's verdict.

Millicent Harvey identified the Defendant in a photo array and at trial. She testified that the Defendant was standing behind the "first car" closest to Buffy's Bar (Buick Rendezvous) (V1) "whispering" and arguing with Terrell "Rell" Antwon just prior to the shooting. N.T. 10/21/15 at pp. 160-61. Steven Guy testified that the Defendant was standing to his left outside

15

of Buffy's Bar and that Byron McDonald was standing to his right. N.T. 10/28/15 at pp. 200-01. McDonald testified that the Defendant carried a .40 caliber semi-automatic firearm to the bar that night and that he observed the Defendant fire multiple shots with that gun at the time of the shooting. N.T. 10/22/15 at pp. 126-27. He also testified that the Defendant ducked behind a car near the curb on Dennie Street when the shooting started. *Id.* Based on this evidence, one could logically conclude that the Defendant was the person standing closest to Clarissa Street near the Buick Rendezvous (V1) shooting the .40 caliber Smith & Wesson.

Eleven FCCs from a .40 caliber Smith & Wesson were collected from the middle to the southwest side of Dennie Street. N.T. 10/23/15 at pp. 196-97. The placement of the FCCs indicated that the Defendant moved to/from the rear of the Buick Rendezvous (V1) parked on the south side of Dennie Street, where Ms. Harvey observed him standing just before the shooting, to/from the middle of Dennie Street. N.T. 10/28/15 at pp. 70-72. Counsel stipulated that the projectile recovered from the decedent's neck was a .40 caliber Smith & Wesson. N.T. 10/27/15 at pp. 144-45. Officer Cruz testified that all of the .40 caliber ballistics evidence recovered was fired from the same .40 caliber Smith & Wesson. *Id.* at p. 122.

The .9 millimeter FCCs discharged from Antwon's firearm indicate that he ran down the sidewalk on the north side of Dennie Street east towards Wayne Avenue as he was shooting. The decedent was shot in the back of the neck on the south side of Dennie Street near Wayne Avenue. Based on the number of .40 caliber Smith & Wesson FCCs, the placement of the .40 caliber ballistics evidence, and the fact that the decedent was shot at the other end of the street from where the shooting occurred *and* on the opposite side of Dennie Street from Antwon, the jury properly concluded that the Defendant used more force than was necessary to save himself from death or serious bodily harm from Terrell Antwon *and* that the Defendant was not free from

16

fault in continuing the use of force which resulted in the decedent's death. The fact that the bullet struck someone other than Terrell Antwon, the person it was intended for, does not change the Defendant's culpability. *See Martin*, 5 A.3d at 208.

Moreover, the Defendant was arguably able to retreat with safety. Ms. Harvey testified that the Defendant was standing behind the Buick Rendezvous (V1) parked on the south side of Dennie Street near Buffy's Bar. As opposed to retreating behind the car or around the corner onto Clarissa Street, the evidence shows that the Defendant positioned himself in the center of Dennie Street and fired at least ten shots, one of which struck the decedent in the back of the neck at the opposite end of Dennie Street near Wayne Avenue. Since the Commonwealth met its burden of disproving Defendant's self-defense claim beyond a reasonable doubt, Defendant's claim that the evidence was insufficient to support the jury's verdict of guilt for voluntary manslaughter fails.

The Defendant also argues that the evidence was insufficient to sustain his convictions for carrying a firearm on a public street in Philadelphia under VUFA § 6108 and Possession of an Instrument of Crime (PIC). Section 6108 provides that "[n]o person shall carry a firearm . . . at any time upon the public streets . . . in a city of the first class unless: (1) such person is licensed to carry a firearm; or (2) such person is exempt from licensing under section 6106(b) of this title[.]" 18 Pa.C.S. § 6108. Testimony of an eyewitness who observed a firearm in a defendant's hand is sufficient to prove a violation of Section 6108. *See Com. v. Robinson*, 817 A.2d 1153, 1162 (Pa. Super. 2003); *Com. v. Monroe*, 422 A.2d 193, 195 (Pa. Super. 1980). To establish a conviction for PIC, the Commonwealth must prove that the defendant possessed "a firearm or other weapon concealed upon his person with intent to employ it criminally." 18 Pa.C.S. § 907(b).

Counsel stipulated that the Defendant did not possess a license to carry a firearm. N.T. 10/28/15 at p. 267. Byron McDonald testified that the Defendant carried a .40 caliber firearm with him when they went to Buffy's Bar, and that he saw the Defendant shoot the firearm on Dennie Street, a public street in Philadelphia. N.T. 10/22/15 at pp. 126-27. The evidence showed that the Defendant actually employed the gun to kill the decedent, which ultimately resulted in his conviction for voluntary manslaughter.

Therefore, Defendant's first issue does not merit relief.

## Issue II

Defendant argues that the verdict was against the weight of the evidence.

A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when "the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience." *Com. v. Cruz*, 919 A.2d 279, 282 (Pa. Super. 2007) (citation omitted).

It is well established that a weight of the evidence claim is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine that notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the

verdict; thus the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.

*Com. v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009) (internal citations and quotation marks omitted).

This court presided over the Defendant's jury trial and observed all of the testimony and evidence presented to the jury. Based on the aforementioned evidence presented at trial, the jury's verdict in this case was not so contrary to the evidence as to shock one's sense of justice.

## CONCLUSION

Based on the foregoing, the judgment of sentence of the trial court should be affirmed.

By the Court:

_____

Rose Marie DeFino-Nastasi, J.